IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRANKIE LEE SMITH,

    Petitioner,                      No. CIV S-06-0009 MCE GGH P

    vs.

EDDIE YLST,[1] et al.,

    Respondents.                  FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2003 conviction for second degree murder and use of a deadly weapon on two grounds: 1) jury instruction error; and 2) ineffective assistance of counsel. Petitioner is serving a sentence of 15 years to life plus one year.

        After carefully considering the record, the court recommends that the petition be denied.

---

[1] The court substitutes Eddie Ylst as the correct respondent. <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir. 1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254) ("A petitioner for habeas corpus relief must name the state officer having custody of him or her as the respondent to the petition.").

II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. <u>Neelley v. Nagle</u>, 138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. <u>Moore v. Calderon</u>, 108 F.3d 261, 263 (9th Cir. 1997).

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. <u>Id</u>. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. <u>Williams (Terry)</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Petitioner raised the two claims raised in the instant action on direct appeal.  The California Supreme Court denied petitioner's petition for review without comment or citation.  Respondent's Lodged Doc. F.  The California Court of Appeal issued a reasoned decision.  Respondent's Lodged Doc. D.  Accordingly, the court must determine whether the denial of petitioner's claims by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct. 2590 (1990).

\\\\\

III. <u>Factual Background</u>

The opinion of the California Court of Appeal contains a factual summary. After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

On the day of the beating that caused his death, the victim, a homeless man named David Palmer, was sitting next to an oak tree outside Hite's Market on Fruitridge Road, [footnote omitted] sharing a 40-ounce beer with Antonio Hernandez and Mike Stribling.

Hernandez testified that defendant approached the group carrying a wooden baseball bat and speaking in an angry way to Palmer. Hernandez speaks no English, so he did not understand what was said. After a time, defendant squatted nearby and continued talking to Palmer. Both defendant and Palmer spoke in raised voices. While Palmer remained seated, defendant suddenly stood up, came nearer, swung the baseball bat with both hands (as if to strike a baseball), and hit Palmer in the back of the head. Hernandez saw Palmer fall to the side and defendant strike him twice more, once in the legs or feet. Hernandez then walked away, afraid that defendant would hit him with the bat.

An employee of the market, Mohammed Afraaz, also saw defendant attack Palmer. However, Afraaz's testimony differed somewhat from Hernandez's. While working on the outdoor gas pump and talking to a friend, Afraaz initially saw defendant, Palmer, Stribling, and a Hispanic man sitting by the oak tree drinking beer. He then saw Stribling hand defendant a baseball bat from the basket on his bike. Holding the bat behind his back, defendant approached where Palmer was sitting by the tree and swung the baseball bat with both hands, striking Palmer in the side of the head or neck. Palmer leaned sideways against the tree. Defendant struck Palmer three more times in the arms and legs, walked away, then returned to strike him two or three times more in, or near, the head.

The clerk working in Hite's Market saw defendant carrying a baseball bat and looking angry.

Ronald Garverick, the detective who responded to the clerk's 9-1-1 call, interviewed defendant and Stribling briefly at the scene. Garverick noticed blood, tissue, and hair on Stribling's back, and found brain matter and blood spatter on the tree next to where Palmer had been sitting and also on the concrete curb surrounding the tree. There was no freshly broken glass at the scene, and the only two 40-ounce beer bottles found there were both intact. Qualified as an expert in blood spatter evidence, Garverick opined that Palmer was sitting in an upright position by the tree when he was struck. Searching a travel trailer located behind the market, Garverick later found defendant's wallet inside, and observed blood drip stains on the kitchen cabinets and refrigerator.

After defendant was overheard to say, "I guess me throwing the bat makes me a witness," officers returned to the scene and found a wooden baseball bat behind the market.

Defendant told investigating officers that he had armed himself with the baseball bat on the day of the incident because he was tired of being harassed by Palmer and he thought Palmer might try to kill him. He claimed to have struck Palmer in self-defense when, in defendant's words, Palmer "came after me with a fucking [broken beer] bottle after fucking hitting me in the arm the day before and I hit him with the bat. And he came at me again, I hit him again. And then he went down and I ran away." Defendant said that he and Palmer had quarreled over Palmer's girlfriend the week of the incident; that Palmer also had thrown a rock and piece of asphalt at him; and that Palmer had threatened defendant's life on the day of the incident and the day before. The videotape of the interview was played for the jury.

The forensic pathologist who performed the autopsy testified Palmer's skull was crushed in a manner consistent with multiple blows to the same location. He had been struck in the head in at least three places, had an oval bruise on his leg consistent with being struck by the narrow end of a baseball bat, and had no defensive wounds on his hands or arms (only a recent, faint, bruise on one shoulder).

/////

1          In contrast, Hernandez and Afraaz testified that in the moments before he was struck, Palmer did not rise from his seated position, did not move toward defendant, and did not break the beer bottle that he was holding.

          Charged with first degree murder, defendant's theory at trial was self-defense. Reiterating his claim that he struck Palmer only after Palmer attacked him with a broken beer bottle, defendant also testified that Palmer had threatened or attacked him in the weeks leading up to the incident on five separate occasions. About two months before the killing, Palmer came to visit defendant in the tent where defendant was living; when defendant refused to share his last beer with him, Palmer took out a knife and began cutting up the tent, saying "[t]his could be you." Five days before the killing, defendant refused to give Palmer money, whereupon Palmer struck him in the throat, knocked him down, and made a threatening remark. Three days before the killing, defendant came home to the trailer in which he was staying behind Hite's Market and discovered Palmer with Palmer's girlfriend; when defendant told them to leave, Palmer pushed defendant out the door. On the day before the killing, defendant, Palmer, and several others were drinking beer outside the market, when Palmer suddenly punched defendant in the eye, heaved an 18-inch chunk of asphalt that hit him in the elbow, and approached him moments later with a 24-inch to 30-inch piece of asphalt as if to bash his head; terrified, defendant called police and reported Palmer's attack. During the night before the killing, defendant heard Palmer's distinctive whistle outside the trailer and woke in the morning to find broken glass strewn on the ground outside the trailer.

          Defendant testified that on the day of the killing, he saw Palmer was drinking beer with a "Mexican guy" by the tree outside the market. When Palmer noticed defendant, he screamed that he was going to 'f-ing kill" defendant, and pantomimed shooting him. Defendant picked up the baseball bat "in case it was needed" to protect himself against Palmer. Later, when Palmer rose to a crouched position and "came at" him, defendant hit Palmer in the knee. Armed with a broken beer bottle, Palmer continued coming at defendant, screaming "[y]ou are mine."

Defendant warned Palmer to "get back or I'm going to f-ing hit you." But Palmer continued, even after defendant landed a "glancing" blow to his head. Acting out of "[p]ure reaction ... [f]ear," defendant then hit Palmer once in the head.

On cross-examination, defendant admitted that he lied to officers when he initially denied hitting Palmer; that he lied when he said the baseball bat was "coinciden[tally]" at hand at the time of the incident; and that he lied about having fought with Palmer over Palmer's girlfriend. Defendant also admitted that he drank every day and was a "functional alcoholic."

In rebuttal, the prosecution introduced the testimony of a woman who volunteered in a homeless meal program and was acquainted with defendant. She testified that defendant is "[v]ery mean" when he drinks. Defendant once punched, choked, and threatened to kill her when she attempted to deliver soup to another homeless man. And she once overheard defendant threaten to beat another homeless person with a baseball bat.

The jury acquitted defendant of first degree murder, found him guilty of second degree murder, and found that he personally used a deadly weapon in committing the crime.

IV. Discussion

    A. Ineffective Assistance of Counsel

    *Standards for Ineffective Assistance of Counsel*

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690, 104 S. Ct. at 2066. The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id., 104 S. Ct. at 2066. "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised

acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id., 104 S. Ct. at 2068.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard. Williams v. Taylor, 529 U.S. 362, 391-93, 120 S. Ct. 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

The Supreme Court has recently emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
>
> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. See Williams, supra, at 411, 65 S. Ct. 363. Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843, 1852 (2002).

/////

/////

*Analysis*

Petitioner argues that his counsel was ineffective for failing to request an instruction regarding the legal doctrine of antecedent threats. In particular, petitioner claims that his counsel should have crafted a pinpoint instruction linking Palmer's threats and violence to his self-defense claim.

On direct appeal in state court, petitioner cited CALJIC 5.50.1 as an example of an instruction which counsel could have modified and requested:

> Evidence has been presented that on prior occasions the alleged victim threatened and assaulted the defendant. If you find that this evidence is true, you may consider that evidence on the issue of whether the defendant actually and reasonably believed his life or physical safety was endangered at the time of the commission of the alleged crime. In addition, a person whose life or safety has been previously threatened or assaulted by another is justified in acting more quickly and taking harsher measures for self protection from an assault by that person than would a person who had not received threats from or previously been assaulted by the same person.

In rejecting this claim the California Court of Appeal found as follows:

> We need not decide whether the failure to request a pinpoint instruction fell below an objective standard of reasonableness. This is so because defendant has not established that the omission was prejudicial.
>
> First, the issue was squarely presented to the jury. Defense counsel argued in closing that the jurors should consider evidence of Palmer's prior threats and violence in assessing defendant's asserted fear of Palmer and his belief in the need to arm himself with the bat to defend himself against Palmer. In counsel's words: "David Palmer was stalking [defendant]. David Palmer had placed [defendant] in a constant and incessant state of fear. David Palmer had physically attacked [defendant] in the immediate past. It was escalating, and that was in [defendant]'s mind, but he still didn't want another confrontation...but he was not going to walk around as he did on the 6th without any way to repel an attack. He wasn't going to walk around as he did on the 8th without any way to repel an attack. He wasn't going to walk around like he did on the 10th without any means to repel an attack. And when David Palmer decided to attack again, it was quick, immediate, and unprovoked and [defendant] defended himself." And the prosecution did not dispute that the attacks by Palmer, if true, would render defendant's self-defense reasonable; rather, she challenged the credibility of defendant's claims that Palmer was a "awful, aggressive, mean man that he was scared of."
>
> Second, defendant's claim of self-defense was contradicted by eyewitness testimony and by the physical evidence. Contrary to defendant's version of events, there was no broken beer bottle, no evidence Palmer was crouched or standing when he was struck, and no evidence of defensive wounds to suggest

9

> Palmer was facing defendant when he was struck.
>
> Third, other than defendant's self-serving testimony, there was no evidence that Palmer had engaged in multiple assaults on defendant. And the effect on defendant's account was weakened by the fact that he mentioned only one of the alleged assaults to officers when he sought to justify his response to Palmer's alleged beer bottle assault. Moreover, defendant's testimony that he lived in mortal fear of Palmer was undermined by evidence that, on the day of the killing, he neither sought to avoid Palmer nor sought police assistance. As the prosecution argued in closing: "[D]o you believe that [defendant] waited for six hours knowing David Palmer, this man that he's in absolute fear of, is sitting right there and he didn't pick up the phone and call the sheriff's department, go into the store and say, 'Call the sheriff's department. He is going to hurt me'?...Of course, you know, the concrete block over the head, forgot to tell anybody about that; the whistling outside the trailer and breaking glass all night long on the 11th, he forgot to tell anybody about that. Because it didn't happen."
>
> Simply stated, even if defense counsel had requested and obtained the pinpoint instruction, there is no probability that defendant would have obtained a more favorable result. Therefore, his claim of ineffective assistance of counsel fails.

Respondent's Lodged Document D, pp. 8-10.

This is not a case where the desired instruction constituted the heart of the defense. Rather the antecedent threats instruction was simply a common sense reminder to the jury that such evidence might be considered in assessing the self-defense claimed by petitioner (and upon which the jury was instructed). There was no instruction which denied the jury the right to consider such evidence in any event. The appellate court found no prejudice, in part, because the argument by defense counsel to the jury on that point was all the reminder that the jury needed. Nor did the prosecution argue that antecedent threats were irrelevant per se – simply that the jury should not believe petitioner. The undersigned could not find, even if reviewing the matter *de novo,* that his confidence in the verdict was undermined because of the lack of this pin point instruction. It follows then, even more clearly that the reasoning by the California Court of Appeal that petitioner was not prejudiced by counsel's failure to request the pinpoint instruction was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

\\\\\

B.  Jury Instruction Error

*Legal Standard*

A challenge to jury instructions does not generally state a federal constitutional claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."  Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness."  Id. at 73, 112 S. Ct. at 482.  The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly.  Id. at 73, 112 S. Ct. at 482.

Where, as in the present case, what is at issue is the failure to give an instruction, petitioner's burden is "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155, 97 S. Ct. 1730, 1737 (1977).  Moreover, a trial judge need not instruct on a defense which would be inconsistent with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).  Failure to give a jury instruction under these circumstances will not amount to a due process violation.  Id.

The burden upon petitioner is greater yet in a situation where he claims that the trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth Circuit has flatly held in non-capital cases that the failure to give the instruction states no federal

claim whatsoever. James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976). Therefore, in order to violate due process, the impact on the proceeding from failure to give an instruction sua sponte must be of a very substantial magnitude.

Furthermore, the Supreme Court has recently held that there is no unreasonable application of federal law where a state appellate court decided that a jury instruction's single incorrect statement of the "imperfect self-defense" standard did not render the instruction reasonably likely to have misled the jury. Middleton v. McNeil, 541 U.S. 433, 124 S. Ct. 1830 (2004).

*Analysis*

Petitioner argues that the trial court violated his constitutional rights when it failed to sua sponte instruct the jury on the legal doctrine of antecedent threats. As discussed above, to succeed on this claim petitioner must demonstrate that the impact on the proceeding from failure to give an instruction sua sponte was of a very substantial magnitude.

This reasoning of the California Court of Appeal in conjunction with petitioner's ineffective assistance of counsel claim that the outcome of petitioner's trial would not have been different had the at-issue instruction been read is equally applicable to the instant claim. Moreover, as noted by the California Court of Appeal in rejection of the instant claim, petitioner was given several instructions in support of his defense: CALJIC Nos. 5.12 (a killing in self-defense is justifiable); 5.15 (prosecution has burden of proving killing not justifiable); 5.30 (right to self-defense against assault); 5.50 (one defending self need not retreat); 5.51 (actual danger not necessary to claim of self-defense); 5.52 (right to self-defense ceases when danger ceases); 5.53 (no right to self-defense after adversary is disabled); 5.54 (aggressor may claim self-defense if he has tried to withdraw); and 5.56 (mutual combat participants may claim self-defense if they have tried to withdraw). Respondent's Lodged Document D, pp. 6-7. The court also instructed with CALJIC No. 5.17 on imperfect self-defense. Id., p. 7.

\\\\\

The trial court's failure to sua sponte instruct the jury on the legal doctrine of antecedent threats did not have a substantial impact on petitioner's trial because the outcome would have been no different had the jury been read this instruction.  Because the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority, this claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 8/24/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

ggh:kj
sm009.157